UNITED STATES *v.* INTERNATIONAL PACKERS, LIMITED (No. 5040)[1]

---

[1] C.A.D. 769.

United States Court of Customs and Patent Appeals, April 14, 1961

*George S. Leonard*, Acting Assistant Attorney General, *Richard E. Fitz-Gibbon*, Chief, Customs Section (*Daniel I. Auster*, trial attorney, of counsel) for the United States.

*Barnes, Richardson & Colburn* (*J. Bradley Colburn*, of counsel) for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[2]

SMITH, Judge, delivered the opinion of the court:

Canned corned beef imported from the Argentine was appraised and entered at United States value. The trial court (R.D. 9304) concluded, as a matter of law, that an item invoiced as "Exchange Retention, 15%" was "a necessary expense from the place of shipment to the place of delivery, and, as such, is allowable as a deduction from the United States selling price in order to compute United States value of the merchandise," as defined in section 402(e) of the Tariff Act of 1930, as amended.

The First Division, Appellate Term, United States Customs Court, (A.R.D. 118) affirmed the decision and judgment of the trial court as amended by the modification thereof, and adopted the foregoing conclusion of law as well as the trial court's findings of fact.

The single issue here is whether the Argentine "Exchange Retention, 15%" is a proper deduction under section 402(e) of the Tariff Act of 1930, as amended, in determining the United States value of the merchandise for appraisement purposes.

On this appeal the Government seeks reversal of the judgment below and argues that the 15% Argentine exchange retention is not a properly deductible expense to be allowed the importer in arriving at the United States value of the imported merchandise.

Resolution of the issue requires that we interpret section 402(e) of the Tariff Act of 1930, as amended, and in particular that we determine the applicability of the portion thereof here shown in italics:

(e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and *other necessary expenses from the place of ship-*

---

[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell*, pursuant to provisions of Section 294(d), Title 28, United States Code.

*ment to the place of delivery*, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods. [Emphasis supplied.]

The present case appears to be a case of first impression in this court. No previous decisions interpreting this section of the statute have been cited by either party as determinative of the issue here and we were advised at the oral argument that no such decision was known to either party. We shall, therefore, approach our resolution of the issue on this basis.

The Argentine Government issued a Decree 2002/55 dated October 27, 1955 by which it undertook readjustment of its foreign exchange controls as a step toward a free market. As a part of this readjustment program a portion of the foreign exchange arising from controlled exports was retained by the Government. The first three articles of said Decree 2002/55, set forth the manner in which particular retention amounts were to be authorized, as follows:

*Article 1.*—When proceeding with the liquidation of the negotiations of the foreign exchange arising from exports, the banks and authorized institutions shall retain up to 25% of the amounts in Argentine Pesos from the said liquidation.

*Article 2.*—The retention established by the foregoing article shall be allotted to the National Economic Re-establishment (Recovery) Fund.

*Article 3.*—The Ministries of Commerce and of Finance shall issue the lists of the products on which there shall be effected such retention, as well as the respective amount. * * *

It has been stipulated that canned corned beef was exportable merchandise subject to the foregoing decree and that retention at the rate of 15 per centum had been authorized and was in effect in connection with the foreign exchange arising from export of the instant merchandise. This stipulation is confirmed by certified excerpts, introduced into the record, from the official list of exportable products promulgated under Decree 2002/55.

The decision here turns on whether this retention of 15 per centum falls within the term "other necessary expenses from the place of shipment to the place of delivery" as used in section 402(e) of the Tariff Act of 1930 as amended.

The factual aspects of the exportation of merchandise under the export regulations of the Argentine indicate to our satisfaction that the 15% exchange retention is a "necessary expense" in connection with export of controlled merchandise from Argentina. The Skidmore affidavit of record states that he is personally familiar with the procedure for export of canned meats from Argentina and that he knows, of his own personal knowledge, of the procedure that was required to be followed in the instant shipment.

Detailing what took place, and referring to documents, certified copies of which, with translations, are attached to his affidavit, Skidmore states as follows:

Under existing regulations of the Government of Argentina all exports of canned meats must be approved by the Junta Nacional de Carnes (National Meat Board). At the time the shipment here in issue took place this Board was called Instituto Nacional de Carnes. For all products approved by the Junta Nacional de Carnes (Corned Beef, Corned Mutton, Roast Beef, Beef with Natural Juices), we, on receipt of a cabled bid apply to them for an Export License by means of the enclosed specimen copy of a "Propuesta do Operación Calzada" (Specimen 1). Approval is generally granted within 24 hours.

Once the approval is in our hands and shipping space has been obtained, the next step is to obtain the Loading Permit (Specimen 2). To obtain the Loading Permit it is first necessary to furnish the details in the "Solicitud de Embarque" (Specimen 3) as per the attached specimen copy and present the certificate to the Junta Nacional de Carnes who checks these details against the Export License (Specimen 1). Provided the details in specimen 1, 2 and 3 are in agreement, the Junta Nacional de Carnes place their approval on specimens 2 and 3 and return both to us.

According to the Argentine Central Bank regulations, all official market exports from the country must be made against pre-payment or an irrevocable letter of credit opened before shipment. Our Canned Meat shipments to the U.S.A. were made against a revolving irrevocable letter of credit. In view of this we are obliged to go to the bank through which the irrevocable letter of credit (with telegraphic reimbursement), has been opened to obtain the bank's certification on the "Solicitud de Embarque" (Specimen 3) to the effect that the letter of credit has been received. At the same time the bank issues an exchange cover form No. 2991 N. 4441 (Specimen 6) on which is shown the total exchange to be delivered and the rate at which it is to be liquidated. This form which serves as proof that exchange has been covered prior to shipment, is delivered to the Customs authorities together with our Loading Permit application and "Solicitud de Embarque" (Specimens 2 and 3).

Under the Letter of Credit system of payment, the banks liquidate the funds to us against the presentation of documents specified by the letter of credit and form 3024 (Specimen 4). This form 3024 (Specimen 4) "Certificado de Embarque para negociar cambio" is prepared after shipment has been effected and shows the exact details in respect to type of product loaded, price, weight, total value. The form is presented to the Customs who check to see that it is in accordance with the Export License, Loading Permit and "Solicitud de Embarque" and if found in order the "Certificado de Embarque para negociar cambio" form 3024, (Specimen 4) is signed by them and returned to us for further handling together with exchange form 2991 N 4441 (Specimen 6). Form 3024 together with 2991 N 4441 (Specimens 4 and 6) are then delivered to the local bank.

Under Argentine Central Bank Circular No. C. 2296 of October 28, 1955, issued pursuant to Decree No. 2002 of October 27, 1955, the foreign currency resulting from the export of various products including canned meats must be negotiated in the official market at the exchange rate of 18 pesos for each U.S. dollar. Further pursuant to the said Circular and Decree, a retention tax of 15% of the exchange resulting from such exports was levied. Said 15% tax was assessed against the full amount of the exchange proceeds which specifically represented in the case of Canned Corned Beef, the full F.O.B. dollar value of the product exported.

In liquidating the letter of credit the bank first converts the U.S. dollars to Argentine pesos at the rate of 18 Argentine pesos to 1 U.S. dollar and then deducts the 15% retention tax from the total peso equivalent according to the Argentine Central Bank Circular C. 2312 (Specimen 5a). The purpose of Circular C. 2312 (Specimen 5a), which is an inter-Bank circular, is to instruct the local banks how to liquidate the 15% retention tax as stated in the Argentine Central Bank Circular C-2296. All exchange sold to the private banks in the official market comes under the control of the Central Bank. In fact, a position account is carried by the banks and all sales and purchases of exchange have to be declared daily to the Central Bank. At the close of each day balances are established and if favourable to the Central Bank, this institution may call upon the private banks to deliver exchange up to the amount of said balances. Vice-versa, the private banks are entitled to draw up to the amount of the balances if these should be in their favour. Once all the documents have been received by the bank and revised by them our account is then credited and we receive a copy of the bank liquidation form (Specimen 5). * * *

In summary, the present transaction involves a contract under which the seller-exporter sold 5,000 boxes of the merchandise for $32,500. The buyer-importer furnished an Argentine bank with an irrevocable letter of credit. The bank exchanged the dollars into pesos at the official rate of 18 pesos per dollar, for a sum total of 585,000 pesos. When the shipping documents were presented to the bank, the seller-exporter received eighty-five percent of the 585,000 pesos. The remaining fifteen percent was forwarded to the governmental agency involved.

The various steps outlined in the entire Skidmore affidavit indicate clearly that the Argentine currency exchange regulation required that provision be made for the payment of the 15% retention as one of the costs in the Argentine before the required export permission was granted. It seems to us, therefore, that this charge is one of the "other necessary expenses from the place of shipment to the place of delivery" within the meaning and contemplation of this term as used in section 402(e) of the Tariff Act of 1930, as amended.

Appellant has cited a number of cases dealing with issues which it contends are analogous to the issue here presented. One group of cases is cited to support appellant's position that the exchange retention would be a part of dutiable value or export value of the involved merchandise. The only issue here arises precisely because there is no foreign or export value of the merchandise.

In *General Dyestuff Corp.* v. *United States*, 19 CCPA 309, T.D. 45480, the issue was whether a royalty charge made by the importer to purchasers in the United States to protect the importer against liability for patent infringement was part of the freely offered price of the merchandise to all purchasers in the principal market of the United States.

*United States* v. *Paul A. Straub & Co., Inc.*, 41 CCPA 209, C.A.D. 553; *Albert Mottola, an Individual Doing Business Under the Name and Style of Atlas Shipping Co.* v. *United States*, 46 CCPA 17, C.A.D. 689; and *United States* v. *Heffernan Paper Co.*, 13 Ct. Cust. Appls. 593, T.D. 41454, were all cases which involved the issue as to whether inland freight charges from the principal market to the port of exportation were part of the statutory export value as in the first two cases, or of foreign value as in the *Heffernan* case. In all of these cases the court was concerned with determination of the market value or price at which the merchandise was freely offered for sale, either for home consumption or for export to the United States.

In the present case there is no dispute as to the market value or price at which the merchandise is freely offered for sale for domestic consumption in the United States. To repeat, the sole issue here is whether the exchange retention charge required by Argentina is within the statutory provision for deduction from the United States sales price of "other necessary expenses from the place of shipment to the place of delivery." No such provision exists in the statutory definition of either foreign value or export value. Accordingly, the court in cases involving a determination of such values was not called upon to and did not pass on the question with which we are here concerned.

Appellant also cites the following cases in support of its position. *John H. Faunce, Phila., Inc.* v. *United States*, 25 CCPA 131, T.D. 49245 (1937); *Stoeger Arms Corp.* v. *United States*, 46 CCPA 59, C.A.D. 696. These cases involved the question of whether an internal revenue or excise tax imposed in the United States on sale *therein* of the imported merchandise was properly allowable under the provisions of section 402(e) of the statute.

In the *Faunce* case the Internal Revenue Tax in question was held not to be a "necessary expense" on the theory that Congress, having differentiated between such expense and customs duties, did not contemplate that Internal Revenue Taxes "which might not accrue for years after the delivery of imported merchandise," should be so considered.

The *Stoeger* case, related to inclusion of an excise tax as a part of the "price" at which the merchandise was sold in the United States, and whether the particular tax was allowable under the provision for "duty." The "necessary expense" provision of section 402(e) was not there involved.

The legislative history of section 402(e) of the Tariff Act of 1930 as amended does not directly aid us in determining what the legisla-

tive intent may have been in using the broad language "other necessary expenses from the place of shipment to the place of delivery."

The Congressional Record, Vol. 71, Part 4, pages 3481–4678, 71st Congress, 1st Session, Sept. 10 to Oct. 18, 1929, contains a statement by Senator Walsh, stating at page 4294:

In effect what the appraiser does when he employs the United States value basis is to work back to an approximate foreign value of the imported merchandise, starting from its first wholesale price here and making deduction of the charges included in or covered by that price subsequent to its leaving the place of production abroad.

While we do not consider such a statement to be determinative of the issue here, it is some indication of the fact that Congress was informed of what an appraiser does when he employs the United States value basis. The effect, according to this statement of Senator Walsh, is to work back to an approximate foreign value. On this basis, ▮ it seems to us the phrase "other necessary expenses from the place of shipment to the place of delivery" should be so construed that the United States value as determined thereunder will approximate a foreign value if one had existed. Since by the Argentine decrees, the 15% exchange retention applies only to permitted exports, we think the inference is clear that it would not be a factor present in a foreign value if one existed. We think, therefore, that its allowance as a "necessary expense from the place of shipment to the place of delivery" is required if, in fact, the United States value is to reflect the approximate foreign value of the merchandise.

We agree with the First Division Appellate Term of the Customs Court that

" * * * the charge exacted by the Argentine Government, the so-called 'retention charge' was not on the exchange of currency as such but 'it is on exchange for a particular purpose,' which was 'in connection with an exportation.' It would, accordingly, appear that the liability for the payment of the so-called 'retention charge' arises at the time the export transaction was entered into. This retention charge is so bound up with and connected with the exportation of the merchandise, as disclosed by the record in this case, that, in our opinion, it is a 'necessary expense' from the place of shipment to the place of delivery, and thus is an allowable deduction in the computation of the United States value."

There has been some confusion in this case as to the proper rate of exchange applicable to certain of the items allowed by the collector. We find no evidence to support the value of 15.3 pesos per dollar. The rate of 18 pesos per dollar is the rate fixed by Argentine decree and was found by the trial court on reconsideration, and by the appellate term on appeal, to be the proper rate to be here applied.

The judgment is *affirmed.*